IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| HAROLD MAXFIELD, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | No. 4:03CV00576 SWW |
| | * | |
| CINTAS CORP. NO. 2, | * | |
| | * | |
| Defendant. | * | |

**Memorandum Opinion and Order**

In July 2003, Harold Maxfield ("Maxfield") filed a lawsuit against his employer, Cintas Corporation No. 2 ("Cintas"), alleging discrimination based on race and military service. In September 2004, the Court granted Cintas's motion for summary judgment and dismissed Maxfield's claims. The Eighth Circuit affirmed the dismissal of the race discrimination claims and reversed and remanded the military service claims. *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544 (8th Cir. 2005). A jury trial is set for the week of June 19, 2006.

Now before the Court is a second motion for summary judgment filed by Cintas to which Maxfield responded. Cintas filed a reply to the response. For the reasons stated below, the Court grants the motion.

**Background**

Randy Lewis, general manager of Cintas's Maumelle, Arkansas facility, hired Maxfield on July 26, 1999, as a service sales representative at a salary of $550.00 per week plus a quarterly bonus. On or about February 1, 2000, Maxfield applied for and accepted the management position of production supervisor at an annual salary of $33,800.00 with no bonus or commission opportunity.

On or about May 22, 2000, Maxfield applied for and was awarded the position of facility outside sales representative ("FOS") with a weekly draw of $650.00. In the position of FOS, Maxfield had the opportunity to earn monthly commissions and quarterly bonuses up to and above his monthly draw.

On July 15, 2001, Maxfield applied for and was granted a military leave of absence until September 28, 2001. Upon his return, Cintas placed Maxfield in the proactive service trainer ("PST") position at a salary of $650.00 per week plus quarterly bonuses. Maxfield claims Cintas demoted him from the FOS position to the PST position because of his military obligations.

On or about January 24, 2002, Maxfield applied for and was granted a military leave of absence through June 15, 2002. In March of 2002, while Maxfield was away, Cintas eliminated the PST position at the Maumelle facility as well as at other facilities throughout the Southeast. When Maxfield returned from military leave of absence on June 17, 2002, Cintas placed him in a telemarketing position at an hourly rate of $16.25 plus overtime and weekly commissions.

On Monday morning, August 19, 2002, Maxfield telephoned Lewis, his direct supervisor, and asked to take a military leave of absence on August 19, 20, and 23, 2002. Maxfield faxed Lewis the orders for military duty and he approved the leave. Maxfield reported to work on Wednesday, August 21, 2002, and pursuant to Lewis's directions, met with Lewis and filled out the paperwork for the leave. At the time same time, Lewis marked Maxfield's attendance calendar, indicating Maxfield would be on military leave on August 19, 20, and 23, 2002. After leaving Lewis's office, Maxfield saw Lisa Wilson, the office manager, and asked her what he needed to do in order to take vacation leave while on military leave. Wilson referred him to the payroll clerk, Tracy Anderson.

Maxfield told Anderson he wanted to take accrued emergency[1] and vacation leave while he was on military duty. Anderson told Maxfield she would take care of his request.

On Monday, August 26, 2002, Maxfield signed his weekly time report provided by Anderson on which she had noted that Maxfield had been "out sick" on August 19 and 20 and "on vacation" on August 23. Anderson gave the signed report to Wilson who gave it to Lewis. Prior to Anderson presenting him with the payroll form and asking him to sign it, verifying his intent to be paid sick leave for August 19 and 20, and vacation leave for August 23, Maxfield did not realize that he would be required to sign and verify the payroll sheet indicating his desire to be paid for time that he was on military leave. According to Anderson, Maxfield was aware that his supervisor had to sign the payroll sheet.

It is the policy of Cintas not to pay employees while they are on military duty because they are receiving pay from the federal government. Maxfield testified that under federal law, he has the right to take any vacation time he has accrued, and it depends on company policy whether he may take sick or emergency days. *See* Undisputed Mat. Facts in Supp. Def's. Mot. Summ. J., Pl's. Dep. at 143-4. Lewis thought that Maxfield violated company policy by requesting emergency and vacation leave while on military duty and that Maxfield was being dishonest in trying to devise a scheme to get extra sick and vacation days by requesting leave from Anderson. Cintas first suspended Maxfield and then terminated him for misconduct on the job. Maxfield contends he was terminated because of his military service.

---

[1]Cintas states that for purposes of its motion, it accepts Maxfield's assertion that he requested "emergency" leave pay for the dates of August 19and 20. Cintas claims that, in actuality, Maxfield told Anderson he was "out sick" on August 19 & 20, and she filled out the appropriate payroll form confirming Maxfield was "out sick" on "8/19/02" and "8/20/02." *See* Def's Statement Undisputed Material Facts in Supp. Sec. Mot. Summ. J., ¶ 37.

In its second motion for summary judgment, Cintas argues that it is entitled to summary judgment on Maxfield's two military service claims because the evidence is undisputed that it would have taken the same employment actions regardless of Maxfield's military obligations.

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). While summary judgment must be used with caution in discrimination cases due to the fact-specific nature of each case, it nonetheless may be proper "when a plaintiff fails to establish a factual dispute on an essential element of [the] case." *Simpson v. Des Moines Water Works,* 425 F.3d 538, 542 (8th Cir. 2005).

At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge .... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morgan v. United Parcel Service of America, Inc.,* 380 F.3d 459, 473 (2004).

**Discussion**

The Uniform Services Employment and Reemployment Act, 38 U.S.C. § 4300 *et seq.* ("USERRA") prohibits employment discrimination on the basis of military service. *Gagnon v. Sprint Corp.,* 284 .3d 839, 852 (8th Cir. 2002).

4

> An employer violates the USERRA "when a person's membership in the informed services is a *motivating factor* in the employer's action, 'unless the employer can prove that the action would have been taken in the absence of such membership, . . . or obligation for service.'' 'Unlike the *McDonald Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer.' Under USERRA, an employee must make "an initial showing . . . that military status was at least a motivating or substantial factor in the [employer's] action." If the employee makes such a showing, "the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status."

*Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 551 (8th Cir. 2005). The Eighth Circuit held that Maxfield presented sufficient evidence to show his military service was a motivating factor in Cintas's decision to transfer him and its decision to terminate him. For purposes of its motion, Cintas does not contest that Maxfield can establish the equivalent of a *prima facie* case. It argues, however, that the undisputed facts prove it would have made the same decisions notwithstanding Maxfield's service in the military.

**2001 Transfer**

In the FOS position, Maxfield received a weekly draw of $650, plus commissions on sales and quarterly bonuses. "A draw was essentially a salary that was advanced on expected sales. However, if commissions on sales were less than the draw, an employee incurred a deficit." 427 F.3d at 547. During the first nine months he was employed in the FOS position (August 2000 - April 2001), Maxfield's sales exceeded his weekly draw and he earned commissions and bonuses with his biggest month being the $7,437.91 he earned in December of 2000. Cintas states that in April, May, June, and July 2001, however, Maxfield's sales dropped to the point that his weekly draw exceeded the commissions he earned from sales, and therefore, he ran negative commission balances for each of those months. In May 2001, his draw exceeded

5

his commissions resulting in a deficit of $857.45. His deficit increased in June to $1,914.46 before he was able to reduce it to $1,339.79 in July 2001.

On July 15, 2001, Maxfield applied for and was granted a military leave of absence until September 28, 2001. When he returned, he was placed in the PST position.[2] The Eighth Circuit concluded that by transferring Maxfield from the FOS position to the PST position, Cintas denied him a benefit of employment under USERRA. Lewis, Maxfield's supervisor, testifies by way of affidavit, that Maxfield was transferred because he had four months of negative commission balances.

> I made the decision to transfer Maxfield out of the FS Sales position solely on his having negative sales commissions for four consecutive months and my assessment that giving Maxfield additional time in the position to reverse his sales performance would not result in bringing his sales up to an acceptable level. Had Maxfield indicated that he would not accept a transfer out of the FS Sales position, he would have been asked to resign or, absent his agreeing to do so, terminated in 2001 for unsatisfactory performance. I also made the decision to waive the almost $5,500.00 in negative commissions which Maxfield owed Cintas, and he started the PST position in August of 2001 with a clean slate.
>
> \*   \*   \*
>
> The decision to make [the transfer from FOS to PST] occurred while Maxfield was away from work on a military leave of absence. During the entire time that Maxfield was employed by Cintas, he was a member of the US Army Reserves, and he requested and was granted no less than fifteen leaves of absence to

---

[2] According to the evidence, Cintas made the decision to transfer Maxfield on August 10, 2001, while he was on military duty. *See* Undisputed Material Facts in Supp. Def's. Mot. Summ. J., Maxfield Dep., Ex. 13.

6

> attend to his military duties and obligations. Cintas is a recognized military-friendly employer, and the fact that Maxfield was a member of the Reserves, had some type of military duties and obligations, or was away from work because of those military duties and obligations played absolutely no part in my decision to transfer him from the FS Sales position to the PST position . . . If anything, Maxfield was given extra, favorable consideration because of his military status, and had his military duties and obligations not taken him away from work on several occasions while he was employed in the FS Sales position, he would have undoubtedly been transferred or terminated before he accumulated four consecutive months of negative commissions as I know of no instance in which Cintas, which operates on a nationwide basis, has ever permitted a FS Sales representative to have more than two consecutive months of negative commissions without being either asked to resign, terminated, or transferred out of the position.
>
> Here again, Cintas was and is in the business of making money, and it makes no business sense to leave someone in a position in which the person is costing a company money rather than contributing to the making of money. Whatever the case, had Maxfield not been associated with the military in any way, had he not had to be away from work for military reasons, and had he incurred four consecutive months of negative commissions as he did in the spring and summer of 2001, I would have made the same decision to remove him from the FS Sales position either by terminating him from Cintas (either by a pressured resignation or discharge) or by transferring him into another position as I did in August 2001. Since no other FS Sales person at Maumelle ever had more than two consecutive months of negative commissions while I was General Manager of the facility other than Maxfield, I do not have any examples of what personnel actions were taken against persons who had the same or similar work performance as Maxfield had in 2001.

Def's. Second Mot. Summ. J., Lewis Aff. at 4-6.

At his deposition in January 2004, Maxfield testified he had no reason to believe the figures showing negative commissions for the months of May-August 2001 were not correct. *See*

Def's. Statement of Undisputed Facts, Maxfield Dep. at 85-6.  He admits he had a negative commission balance of $857.45 for the month of May, and by the end of June, the deficit had risen to $1,914.46.  By the end of July 2001, he had a negative balance of $1,360.70.  These deficits are cumulative, and Maxfield says he could not accumulate any deficits in August because he went on military leave on July 15, 2001.  He states the deficit amounted to two weeks of compensation, and he was not expected to make sales while on military duty.  Maxfield testified he did not draw a salary from Cintas between July 20, 2001, until he returned from military leave on October 3, 2001.  Pl's Resp. to Second Mot. Summ. J., Ex. 14 at 80.  Therefore, the time between the middle of July until August 10, 2001, when Cintas decided to transfer him, should not be counted toward any earning figures.  Thus, Maxfield argues, he did not have four consecutive months of negative commissions deficits.

Maxfield also questions Lewis's testimony that once he had four consecutive months of negative commissions, Cintas only had two options, to transfer him or terminate him.  Maxfield points out that Randy Lunsford, his sales manager, placed him on a performance improvement program on June 21, 2001, *id.* , Ex. 5 to Ex. 4 [docket entry 63] but he was not able to complete it because he went on military leave.  Further, Lunsford testified that Cintas does not expect Maxfield to make sales while he is on military duty.  *See id.*, Ex. 4 at 129.

Lynn Clayton, a sales representative, admitted he had a sales deficit and was put on a last chance agreement addressing improvements in his sales.  *Id.*, Ex. 7 at 13.  Clayton testified that it was not uncommon for a sales person to have a deficit but "when you're in it you work your tail off to get out of it.  You don't quit.  You don't take days off, you do anything but think about

that deficit." *Id*. at 15.  Clayton said he had a deficit for more than one month at a time but he had it cleared up by the second month.  *Id.* at 14.  He also testified Maxfield was the only sales representative he worked with that had to take off for military duty.  *Id.* at 15-16.

It is Cintas's burden to prove by a preponderance of the evidence that it would have transferred Maxfield from the FOS position to the PST position regardless of his military service. In his sworn affidavit, Lewis says Maxfield was transferred because he had four consecutive months of deficits.  Maxfield presents no evidence to dispute the accuracy of figures. Maxfield admits he ran a deficit for May, June, and the first two weeks of July. He seems to a argue that because he could not make sales while on military duty, Cintas cannot come to the conclusion that he had four consecutive months of negative commission balances. Further, he argues Lewis "perjured himself in his Affidavit when he stated that [Maxfield] had deficits exceeding $5,000.00."  Pl's Br. in Supp. Resp. to Mot. Summ. J., at 19.

The Eighth Circuit held that Maxfield had presented sufficient evidence to create a genuine issue of material fact that his military service was a motivating factor in Cintas's decision to transfer him.  In discrimination cases, where the burden of persuasion is on the plaintiff to show that the defendant's stated reason was pretexual, evidence used to support the prima facie case is considered along with other evidence before the court to determine whether there exists a triable fact on the ultimate issue of discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000)("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  The Eighth Circuit found the

fact that Maxfield was transferred the day he returned from military service; that Lewis's "boss" called Sergeant Grissett, who was responsible for preparing Maxfield's orders, inquiring whether Maxfield was present at the military base and whether his presence was imperative; and the fact that Lewis and Johnson traveled to the military base while Maxfield was on leave to discuss, in part, his sales deficits, was sufficient evidence showing his military service was a motivating factor. 427 F.3d at 552.

The Court finds that Maxfield has failed to come forward with any evidence to establish a genuine issue of material fact that Cintas would not have transferred him even if Maxfield had not engaged in any type of military activities. It is undisputed that Maxfield had two months of negative sales commission before he began his military duty in July of 2001, and that the decision to transfer him was made in August 2001. In light of Lewis's sworn affidavit and without any countervailing affidavit or sworn testimony to create a genuine issue for trial, the Court finds the motion for summary judgment should be granted on Maxfield's transfer claim.

**Termination**

The parties do not dispute that on August 21, 2002, Maxfield reported to Lewis's office and Lewis filled out two forms to place Maxfield on military leave on August 19-20, and August 23, 2002. Maxfield signed the forms, and Lewis testified he marked Maxfield's attendance calendar indicating military leave on August 19-20 and 23. Maxfield did not tell Lewis during their meeting on August 21 or at any other time that he wanted to take sick/emergency leave on August 19-20, 2002, and vacation on August 23, 2002. Lewis testified that had Maxfield wanted to use vacation during his military leave and get paid for those days, all he had to do was ask.

Pl's. Resp. to Second Mot. Summ. J., Ex. 3 at 41 [docket entry 53].  Instead, after Maxfield left Lewis's office, he contacted the payroll clerk, Tracey Anderson, and told her he wanted to take emergency leave on August 19-20, and vacation on August 23.   On Monday, August 26, 2002, Maxfield signed a form provided him by Anderson, verifying that it was his intent to be paid sick leave on August 19-20 and vacation pay on August 23.  Maxfield admits that he was not aware that he had to sign the payroll sheet because that was a new policy, but he was aware that his supervisor, Lewis, had to sign the payroll sheet.  Maxfield argues that because supervisors must approve the weekly time detail before payroll enters it into the computer, he did not violate company policy that all requests for pay for time missed had to be approved by an employee's direct supervisor.

Lewis testified Maxfield knew his attendance calendar had been marked to show military leave on August 19-20, and 23, 2002, which is unpaid, and so by telling the payroll clerk rather than Lewis that he wanted to take sick/emergency and vacation leave, Maxfield intended to get the benefits of paid leave days without his calendar showing he had taken them.  *Id.* at 46-49 [docket entry 54].  Maxfield denies any attempt to "steal" paid leave days or that he was trying to circumvent the system.  He asserts that he was terminated because of his military obligations.

In support of Cintas's second motion for summary judgment, Lewis states in his affidavit:

> I considered several scenarios which could have occurred as a result of Maxfield's actions, and I came to the unmistakable conclusion that Maxfield had purposefully tried to obtain additional paid days off by fraudulent means.  In short, I came to the conclusion that he was trying to steal paid days off from Cintas.  There was simply no other reasonable explanation for his actions.  I made the decision to suspend Maxfield during which a thorough investigation and review of the facts was conducted, and following that investigation and review, I decided to

> discharge Maxfield for conduct on the job in that he committed a serious violation of Cintas's rules and policies.
>
> I made the decision to terminate Maxfield based solely on his actions in attempting to obtain paid days off on a fraudulent basis. The fact that Maxfield was a member of the Reserves, had some type of military duties and obligations, or was away from work because of those military duties and obligations played absolutely no part in my decision to discharge him. Had Maxfield not been associated with the military in any way, had he not had to be away from work for military reasons, and had he engaged in the same fraud attempting to obtain paid days off improperly, I would have made the same decision to discharge him. I do not know of any situation at Cintas in which another employee attempted to obtain paid days off on a fraudulent basis as did Maxfield, but there were other instances of where employees attempted to cheat Cintas or to steal money or other things from Cintas. In each of those instances, I took the same action and discharged the offending employees.

Def's. Second Mot. Summ. J., Attach A, Lewis Aff. at 11-12.

In holding Maxfield presented sufficient evidence that his military status was a motivating factor in the decision to terminate him, the Eighth Circuit stated:

> As for proximity, Maxfield was suspended the day he returned from the three-day leave and discharged a few days later. Sergeant Grissett testified that, as in 2001, someone from Cintas called him in August 2002 asking whether Maxfield was present for duty and whether his presence was necessary.
>
> Moreover, there are numerous inconsistencies in Lewis's explanation that Maxfield violated company policy by requesting emergency and vacation leave while on military leave. Although Lewis testified that Cintas did not allow employees to take sick/emergency leave while on military leave, Johnson, the human resources manager, testified that Cintas allowed employees to take accrued emergency leave while on military leave, that a supervisor does not have the authority to refuse a request for the leave, and that all management had been so notified. Indeed, when asked 'under what circumstances would a supervisor deny an employee from taking the

> vacation and sick leave and whatever accrued leave they have while on military duty,' Johnson, replied, 'There are no circumstances if requested.' It is surprising that in his deposition, Lewis testified that he had learned nothing during his investigation that caused him to change his mind that Maxfield had violated company policy by requesting sick/emergency leave while on military leave, but Johnson testified that he participated in the investigation, and a reasonable inference would be that Johnson would have informed Lewis that an employee could take accrued emergency leave while on military leave.
>
> There are also inconsistencies in Lewis's explanation that Maxfield had been dishonest in devising a scheme to 'steal' extra sick and vacation days by requesting leave from Anderson. Indeed, Lewis did not even contact Anderson to determine whether Maxfield had called her to tell her that he was 'out sick,' or whether he told her he wanted to take his accrued sick/emergency leave while on military duty. In addition, Lewis testified that because the requirement that employees had to sign weekly time sheets was new, Maxfield would have 'no idea' that Lewis would see Maxfield's signed weekly time report and thus not record the emergency and vacation leave on his attendance calendar. However, Lewis testified that the requirement did not change Cintas's policy that supervisors had to approve all leave requests and approve the weekly time report. Lewis also testified that because Maxfield had been a supervisor of hourly employees, he would have known that supervisors had to approve leave and the weekly time sheets. It is also undisputed that as the payroll clerk Anderson had no authority to process a weekly time report for payment until the supervisor approved the report.

427 F.3d at 553-4.

Maxfield offers no evidence to create a genuine issue of material fact that Cintas would not have terminated him absent his military duty. While the Court of Appeals cited inconsistencies in Lewis's explanation that Maxfield had been dishonest in devising a scheme to steal extra sick and vacation days by requesting leave from Anderson, there is no dispute that Lewis knew Maxfield was entitled to take accrued emergency and vacation leave while on military duty if the

13

employee requested to do so.  Lewis testified he would have granted such a request.    Although the Court may question the validity of Lewis's suspicions, there is no evidence that Lewis acted on anything but those suspicions.  Lewis's decision was not based upon Maxfield's military obligations but on Maxfield's attempt, in Lewis's opinion, to go around him in an effort to get company paid days off.  The calendar Lewis completed in Maxfield's presence showed Maxfield taking off August 19-20 and 23 for military duty.   While it is true that Lewis had to approve the weekly time report prepared by Anderson showing sick and vacation leave for those dates, it is also undisputed that Maxfield did not know of the new requirement that he had to sign the weekly time report, which conflicted with the leave calendar.

The Court understands Cintas must prove by a preponderance of the evidence that it would have made the same decision despite Maxfield's protected status.  Other than deny he was attempting to circumvent the system and be paid for days without his attendance sheet showing paid days off, Maxfield offers no evidence to dispute Cintas's explanation for its actions.  The Court finds Cintas has shown that the same action would have been taken against Maxfield regardless of the fact that he served in the military.  As in other discrimination cases, it is not the Court's role to act as a "super-personnel department to second guess the wisdom of a business's personnel decisions." *Evers v. Alliant Techsys., Inc.,* 241 F.3d 948, 957 (8th Cir.2001) (internal quotation marks omitted).  Because there is no evidence from which a reasonable jury could find that Cintas would not have made the same decision even if Maxfield did not have military obligations, the Court finds the motion for summary judgment should be granted.

**Conclusion**

IT IS THEREFORE ORDERED that defendant's second motion for summary judgment[3] is granted. Plaintiff's claims are dismissed with prejudice. Judgment will be entered for defendant.

DATED this 25th day of May 2006.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[3] Docket entry 43.